# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

WILLIAM SCHULTEN, JR.,        :

      Plaintiff,            :

                                Case No. 3:08cv003

  vs.                   :

                                District Judge Walter H. Rice

MICHAEL J. ASTRUE,         :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,      :

      Defendant.           :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

The Social Security Administration provides Disability Insurance Benefits (DIB) to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."[2]

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Various health problems, including a heart attack in March 2002, led Plaintiff William Schulten, Jr. to file an application for DIB on January 8, 2003. (Tr. 127-29, 155). He asserted that beginning on December 1, 2002, he was under a disability and unable work. (Tr. 127-29). His DIB application was denied at during two rounds of administrative review.

During his first round of administrative proceedings, Plaintiff was provided a hearing before Administration Law Judge (ALJ) Daniel R. Shell. (Tr. 439-66). ALJ Shell issued written decision in September 2005 denying Plaintiff's DIB application based on the conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 331-45).

Plaintiff requested, and was granted, review by the Social Security Administration's Appeals Council. The Appeals Council found that the ALJ Shell's decision did "not satisfy the requirements set forth in the Social Security Administration regulations and the Social Security Rulings...." and remanded the case to the ALJ for further proceedings. (Tr. 352-54).

On remand, ALJ Shell held another hearing (Tr. 467-90) and later issued his second decision denying Plaintiff's DIB application on the ground that Plaintiff was not under a disability. (Tr. 39-61). ALJ Shell's second decision later became the final determination of the Commissioner of the Social Security Administration. Such final determinations are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ Shell's second decision, or at a minimum, remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ Shell's second decision.

II.     **ADDITIONAL BACKGROUND**

On the date of the ALJ's decision, Plaintiff's age (60 years old) placed him in the

category of a person of "advanced age" and "closely approaching retirement age " for purposes of resolving his DIB application. *See* 20 C.F.R. §404.1563(e); *see also* Tr. 473. He has a high school education with two years of college. (Tr. 161). And he has worked in the past as a "material handler," a cashier and cook at a restaurant, and a retail manager. (Tr. 180-184).

Plaintiff testified during his first administrative hearing that he was working part-time at an Arby's restaurant. (Tr. 441-42). He only worked four or five hours a day, four days a week. Working causes him to become very tired, worn out. (Tr. 448).

He testified that he became disabled when he had a heart attack in March 2002. (Tr. 445). He takes medication for high blood pressure, has high cholesterol, was overweight, and has numbness in his hands and fingers. (Tr. 445-46). He further testified that he experiences shortness of breath upon exertion and has chronic fatigue. (Tr. 445, 449-50). He also experiences chest pain and occasional dizziness. Stress aggravates his symptoms, sometimes causing him chest pain several times a week. (Tr. 448). He wears wrist splints at night to alleviate symptoms of bilateral carpal tunnel syndrome. He has trouble sleeping during the night and takes medication for depression. (Tr. 449).

During his second administrative hearing Plaintiff testified that he continued to be disabled due to heart disease. He indicated could walk only a couple of blocks before getting short of breath. He used to try to mow the lawn, but after 15 minutes he would need to sit down and rest, because he felt physically worn out. Stress and anxiety also wore him down. He slept about eight to ten hours a night, but still felt worn out. (Tr. 472-76).

He further testified that he was 6 feet tall and weighed about 260 pounds. He noted that he had lost 10 pounds but gained it back because when he was depressed or stressed, he would "wind up eating, and then ... put on weight." (Tr. 475). He characterized this as "a vicious circle." *Id*. Plaintiff testified he did not do much around the house, although he could do the dishes. He thought he could run a vacuum cleaner for 10-15 minutes. (Tr. 475-76).

The parties have provided detailed and informative descriptions of Plaintiff's medical

records supported with many specific citations to evidence of record. *See* Doc. #10 at 3-9; Doc. #12 at 2-9. In light of this, and upon the Court's consideration of the record as a whole, there is no need to fully reiterate or expand the parties' descriptions. Still, describing a few medical source opinions will help frame further review.

Plaintiff relies on the opinions of Alan R. Boerger, Ph.D., who performed his first psychological evaluation on March 24, 2003. (Tr. 250-54). Dr. Boerger felt that Plaintiff displayed characteristics of some mild depression as well as anxiety. He diagnosed a depressive disorder not otherwise specified (NOS) and an anxiety disorder, NOS. He assigned a GAF of "62 (current)" (Tr. 254),[3] thus referring to a person with "[s]ome mild symptoms ... or moderate difficulty in social, occupational, or school functioning ... but generally functioning pretty well...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (DSM IV-TR) at p. 34. Dr. Boerger concluded that Plaintiff's ability to relate to others was mildly to moderately impaired, as was his ability to withstand the stress and pressures associated with day-to-day work activity. (Tr. 254).

Dr. Boerger evaluated Plaintiff a second time on March 13, 2006. (Tr. 402-07). Dr. Boerger opined that Plaintiff's depression was only partially controlled with mediation. He again diagnosed a depressive disorder NOS and anxiety disorder NOS. He assigned a GAF of "56 (current)" (Tr. 406), referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM IV-TR at p. 34. Dr. Boerger also believed that Plaintiff's "GAF score for functioning would be rated at 59 because of periodic conflicts with others in work and other stressful situations." (Tr. 406). Dr. Boerger felt Plaintiff was moderately impaired in his ability to relate to others, including fellow workers and supervisors; his ability to understand and follow

_____

[3] Health care professionals use GAF, or Global Assessment Functioning, to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

instructions was mildly impaired when he was rested but might become moderately to markedly impaired with fatigue; his ability to maintain attention to perform simple repetitive tasks was mildly to moderately impaired; and his ability to withstand the stress and pressures associated with day-to-day work activity was moderately impaired "as a result of the depression and anxiety and reflected in reports of conflicts with customers at work." (Tr. 406-07).

Plaintiff further relies on the June 2003 opinions of examining physician Damian Danopulos, M.D. (Tr. 277-87), who listed five objective findings: "1) right knee early arthritis, 2) history of previous heart attack without current angina pectoris, 3) subjective complaints of effort-related shortness of breath, 4) poorly controlled hypertension, and 5) exogenous obesity." (Tr. 287). Dr. Danopulos concluded that Plaintiff's ability to do any work-related activities "is mainly affected from his uncontrolled hypertension which suggests a non-stressful job in order to prevent any further elevation of his blood pressure." (Tr. 287).

Plaintiff also relies on the opinions of treating physician, Robert Klamar, M.D. (Tr, 305-09). In March 2004 Dr. Klamar reported that Plaintiff could occasionally lift and carry ten pounds and could frequently lift and carry five pounds; he could sit for eight hours without interruption, for a total of five hours during a workday; and he could stand and walk for four hours without interruption, for a total of four hours during a workday. (Tr. 306). Dr. Klamar briefly noted that Plaintiff had fatigue with repetitive exercise and fatigue with exertion, even walking. (Tr. 305–06). Dr. Klamar indicated that Plaintiff could perform sedentary work on a sustained basis (in an eight-hour workday), but he could not perform medium or light exertional work.[4] (Tr. 309).

In January 2006 Dr. Klamar noted that since Plaintiff's heart attack, he "has had very

---

[4]  Under the Regulations, "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." §404.1567(b). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." §404.1567(c).

poor exercise tolerance with excessive fatigue." (Tr. 431).  Dr. Klamar concluded that Plaintiff "is disabled due to fatigue and poor exercise tolerance following his heart attack." (Tr. 431).

The Commissioner relies on the contemporaneous notes of Plaintiff's cardiologists, Sukir Sinnathamby, M.D. and Mohamed Fazel Khan, M.D.  Dr. Sinnathamby performed cardiac catheterization in March 2002.  (Tr. 232-43).  In April 2002 Dr. Sinnathamby reported that Plaintiff was doing very well from a cardiac standpoint with no complaints of chest cardiomyopathy of anginal type, although he had fleeting chest discomfort.  (Tr. 249). Plaintiff had no shortness of breath, presyncope, or syncope.  *Id*.  Plaintiff's blood pressure was 112/84 and the remainder of his examination was normal.  Dr. Sinnathamby continued Plaintiff on his current medical regimen and noted that he needed to go to cardiac rehabilitation and could return back to work in two weeks.  *Id*.

In July 2002 Dr. Sinnathamby observed that Plaintiff was doing very well from a cardiac standpoint with no anginal chest pain, shortness of breath, or decrease in activity.  (Tr. 247).  Plaintiff was back to work and worked for about two hours before he got tired. Plaintiff's blood pressure was 122/88, pulse was 76, and the remainder of the examination was normal.  *Id*.

In October 2003 Plaintiff saw Dr. Khan for follow-up of a stress test.  (Tr. 300).  Dr. Khan noted Plaintiff appears to be having some effort intolerance which could be attributed to his physical deconditioning. *Id*.  To rule out any significant obstructive disease, Dr. Khan ordered an angiogram.  *Id*.  Dr. Khan further reported that Plaintiff's cardiac condition was stable.  *Id*.

Plaintiff returned to see Dr. Sinnathamby in May  2004.  Dr. Sinnathamby noted that Plaintiff was "doing fairly well," had no change in his chest pain since the previous year with no increase in frequency, but he continued to be fatigued.  (Tr. 383).  Plaintiff's blood pressure was 138/92, pulse was 88, and the remainder of the examination was unchanged. Dr. Sinnathamby discussed the options including stopping the Toprol, but Plaintiff did not want to

stop it. An electrocardiogram was unchanged and no acute changes were noted. *Id*.

The Commissioner also relies on the opinion of Dr. Paul Boyce, the medical expert, who testified during both administrative hearings. Dr. Boyce opined that Plaintiff's limiting factor was not so much his obesity but his deconditioning. (Tr. 482). When asked about the effect Plaintiff's weight has upon his Residual Functional, Dr. Boyce testified that it should not have an effect unless Plaintiff had another "major physical condition such as a pulmonary condition or a cardiac condition in which there is deterioration in myocardial function." (Tr. 482). He further explained, "lots if people at these weights are capable of doing very much, but if you decondition then you lose your capability." *Id*. In light of this opinion, Dr. Boyce believed that Plaintiff was capable of performing medium work. *Id*.

## III.   ADMINISTRATIVE REVIEW

The Commissioner has developed five sequential questions to determine if an individual is under a "disability" within the meaning of the Social Security Act:

1.   Is the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). If the ALJ makes "a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730

(citations omitted).

In the present case, the ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful employment since December 1, 2002. (Tr. 60). The ALJ found at Step 2 that Plaintiff has severe impairments of "ischemic heart disease with history of myocardial infarction and hypertension." (Tr. 60). The ALJ further found, "Obesity does not constitute a 'severe' impairment." *Id.*

The ALJ determined at Step 3 that Plaintiff does not have an impairment or a combination of impairments that meet or equal one of the listed impairments. *Id.*

At Step 4 the ALJ concluded that Plaintiff has the Residual Functional Capacity to perform a limited range of medium work.[5] The ALJ described his specific findings as follows:

> He can lift as much as 50 pounds occasionally and 25 pounds frequently. The claimant can stand and walk as much as six hours during any given eight-hour workday. He is able to bend and stoop frequently. He can use his upper extremities for grasping, holding, and turning objects (20 CFR 404.1567(c)).

(Tr. 60). The ALJ continued:

> Even if it were found that the claimant was restricted to performing only light work as such work is defined for Social Security purposes (lifting no more than 20 pounds occasionally and ten pounds frequently; walking and standing as much as six hours during any given eight-hour workday; only occasional stooping; and upper extremity use for grasping, holding, and turning objects), a finding of not 'disabled' would still result (20 CFR 404.1567(b)).

(Tr. 61). The ALJ's findings led him to conclude at Step 4 that Plaintiff could perform his past relevant work as a fast-food worker, foot manager trainee, sales attendant, insurance sales agent, or home attendant. (Tr. 61). In light of this conclusion, the ALJ's sequential evaluation ended at Step 4, resulting in the ALJ's ultimate conclusion that Plaintiff was not

---

[5] The Regulations define Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c).

under a disability and hence not eligible for DIB.  (Tr. 60-61).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance..."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*.  *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994).  And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V. DISCUSSION

### A. The Parties' Contentions

Plaintiff contends, in part, that the ALJ erred at Step 2 of the sequential evaluation by failing to find that Plaintiff's depression and obesity constituted severe impairments.

The Commissioner argues that the ALJ did not err at Step 2, and that he did not "screen out" Plaintiff's disability claim at Step 2 but continued to evaluate it through Step 4. The Commissioner further argues that the ALJ reasonably concluded Plaintiff had the residual functional capacity to perform a range of medium work based on the opinions of Dr. Boyce, the medical expert who testified during the ALJ's hearings.

### B. Analysis

Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – presents "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The purpose of this very low evidentiary hurdle is to "screen out claims that are 'totally groundless.'" *Higgs*, 880 F.2d at 862 (quoting in part *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89-90 (6th Cir. 1985)). The *Higgs* Court characterized the dismissal of a disability claim at Step 2 based on medical evidence alone as "exceptional." 880 F.2d at 863.

The ALJ's decision addressed Plaintiff's obesity as follows:

> Dr. Boyce was asked to testify to the effect of obesity on the claimant's condition and his overall health. He stated that treating physician Dr. Khan cited de-conditioning as influencing the claimant's condition more so than obesity. (Exhibit 15 F at 12). A letter from the claimant's employer was read to Dr. Boyce. That letter states that the claimant can only work four or five hours because 'he tires easily.' Such fatigability is, in the opinion of Dr. Boyce, brought about by de-conditioning (as cited by Dr. Khan) more so than obesity. Dr. Boyce testified that the claimant is not excessively obese. His weight has remained relatively stable in the recent past (varying from about 246 pounds to 268 pounds). His body mass index (BMI) is not unusual in the current

10

population.  Dr. Boyce testified that for an individual 72 inches in height, a BMI
of '40' is indicative of morbid (pathological) obesity.  For an individual 72
inches in height, a BMI of '34' is consistent with a weight of 240-250 and a
BMI of '37' is consistent with a weight of 260 pounds.  Ideal body weight for
an individual 72 inches in height is consistent with a BMI of '26-29.'  Thus, the
claimant's BMI which is generally about '35' is not indicative of morbid
(pathological) obesity.  Dr. Boyce testified that the claimant would benefit from
losing weight but that he is not morbidly obese.  Absent an objectively
identified medically determinable medical condition (such as pulmonary disease
or cardiac abnormality with loss of cardiac function), an individual's residual
functional capacity should not be adversely affected by obesity or BMI
consistent with the claimant's weight and measured BMI.  Dr. Boyce testified
that such requisite pulmonary or cardiac abnormality is not present in this case.
Thus, although the claimant's weight exceeds an ideal weight for his height, the
claimant is not morbidly obese based on recognized medical standards.  In the
opinion of Dr. Boyce, the claimant's weight is not a significant factor in his
current medical status.  De-conditioning is a greater problem.  Based on the
entire record and taking into consideration the claimant's BMI, Dr. Boyce
testified that the claimant should be capable of performing work at the medium
level.

(Tr. 51).

Plaintiff contends that the ALJ erred by not finding Plaintiff's obesity to constitute a

severe impairment at Step 2 of the sequential evaluation.  Plaintiff emphasizes that the fact

that his obesity did not rise to the level of "morbid" or extreme obesity does not mean that his

obesity was not a severe impairment.

The National Institute of Health's clinical guidelines are recognized by the

Commissioner in Social Security Ruling 02-01p, 2000 WL 628049 at *2 (Sep. 12, 2002).

Ruling 02-01p describes, in part, the three levels of obesity set forth in National

Institute of Health's clinical guidelines.  Under those guidelines, Plaintiff's body mass

index falls within Level II.  *See* 2000 WL 628049 at *2.  This helps Plaintiff show error in the

ALJ's decision at Step 2 because Ruling 02-01p further states:

> There is no specific level of weight or BMI that equates with a 'severe'
> or a 'not severe' impairment. Neither do the terms for levels of obesity (e.g.,
> 'severe,' 'extreme,' or 'morbid' obesity) establish whether a obesity is or is not

11

a 'severe' impairment for disability program purposes.  Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.

2000 WL 628049 at *2.  In light of this, the ALJ erred by focusing on the fact that Plaintiff's BMI did not rise to the level of morbid obesity and by focusing on Dr. Boyce's testimony that Plaintiff was not morbidly obese, *see* Tr. 51, rather than conducting an individualized assessment of Plaintiff's obesity under the legal standards set by the Regulations and explained in Ruling 02-01p.

Perhaps more significantly, the ALJ relied heavily on Dr. Boyce's opinion both in concluding that Plaintiff's obesity was not a severe impairment and in finding that he has the ability to perform medium exertional work.  *See* Tr. 50-53.  The ALJ's decision, however, contains no analysis of Dr. Boyce's opinions under the various factors set forth in the Regulations.  *See id.*  Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source.  *See* 20 C.F.R. §404.1527(d).  As to non-treating medical sources – such as medical experts, like Dr. Boyce, who testify during the administrative hearing – the ALJ must evaluate their medical opinions under the same factors applicable to treating medical sources – supportability, consistency, specialization, *etc*.  *See* 20 C.F.R. §416.927(d), (f).  The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. §416.927(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see also* 20 C.F.R. §416.927(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §416.927(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).  The ALJ erred by not explaining what regulatory factor led him to fully credit Dr. Boyce's opinions, particularly at Step 2 when finding that Plaintiff's obesity was not a severe impairment and at Step 4 when finding that Plaintiff could perform medium exertional work.  *See* Tr. 50-53.

Next, the ALJ also concluded that Plaintiff's depression did not constitute a severe impairment at Step 2 based in part of the opinions of Dr. Boerger that Plaintiff had only mild

degree of mental work limitations. The ALJ, however, failed to recognize that Dr. Boerger believed, after his second evaluation of Plaintiff, that Plaintiff was moderately impaired in his ability to relate to others, including co-workers and supervisors, due to low frustration tolerance. (Tr. 406). Dr. Boerger further opined that Plaintiff's ability to understand instructions would deteriorate when he became fatigued such that this ability would then become moderately to markedly impaired. *Id.* And Dr. Boerger thought that Plaintiff's ability to withstand the pressures and stress associated with daily work activity was moderately impaired. (Tr. 407). By overlooking or ignoring these aspects of Dr. Boerger's opinions, which supported the conclusion that Plaintiff's depression constituted a severe impairment, the ALJ erred by focusing only Dr. Boerger's earlier opinions to support his non-severe findings at Step 2. "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)(citing in part *Switzer v. Heckler*, 742 F2d. 382, 385-86 (7th Cir. 1984)).

The Commissioner maintains that the ALJ did not commit <u>reversible</u> error at Step2 because he continued his evaluation through Step 4, including an assessment of Plaintiff's Residual Functional Capacity. For this argument to be valid, the ALJ's evaluation of Plaintiff's Residual Functional Capacity must consider the claimant's severe and non-severe impairments. *See* 20 C.F.R. §404.1545(a)(2); *see also* Social Sec. Ruling 96-8p, 1996 WL 374184 at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"); *Jamison v. Commissioner*, 2008 WL 27955740 at *8-*9 (S.D. Ohio 2008)(Dlott, D.J.; Hogan, M.J.)(distinguishing *Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). The ALJ failed to do so in the present case.

After the ALJ determined that Plaintiff's depression did not constitute a severe impairment at Step 2, the ALJ erred by not considering this as a non-severe impairment at Step 4 when assessing Plaintiff's Residual Functional Capacity. *See* Tr. 55-59. This was contrary to the mandate of the Commissioner's Regulations, *see* 20 C.F.R. §404.1545(a)(2),

and Rulings, *see* Social Sec. Ruling 96-8p, 1996 WL 374184 at *5.

Plaintiff also argues that the ALJ's analysis of Plaintiff's fatigue was insufficient. At Step 2 of the sequential evaluation, the ALJ mentioned Plaintiff's "fatigability" as follows:

> Fatigability is documented in the record. However, the cause of such fatigability appears to be de-conditioning more so than a medically determinable impairment and/or obesity. As such, it remains within the claimant's voluntary control. There is no evidence of reduced cardiac function that would cause such fatigability. The claimant's hypertension is generally effectively controlled and should not result in excessive fatigue.

(Tr. 52). The ALJ did not specifically discuss the impact Plaintiff's heart condition or depression had on his fatigue. This was no minor omission because Plaintiff's medical records contain some objective medical evidence – exercise cardiolite stress tests showed that Plaintiff had poor exercise capacity, *see* Tr. 244, 434 – in support of his claim to disabling fatigue.

In addition, the ALJ relied on Dr. Danopulos' report by selecting only the remarks tending to show support that Plaintiff could perform medium exertional work – such as Dr. Danopulos' notes that Plaintiff moved freely in the exam room. Movements were normal and he had normal gait without ambulatory aids. *See* Tr. 56, 277-87. But the ALJ ignored other findings by Dr. Danopulos regarding Plaintiff's ability to handle stress – such as his notes indicating that Plaintiff's work abilities were "mainly affected from his uncontrolled hypertension which suggests a non-stressful job in order to prevent any further elevation of his blood pressure." (Tr. 281). Again, "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza*, 219 F.3d at 393; *see Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

The Commissioner contends that "Nothing requires an ALJ to recite each and every line of a physician's opinion." (Doc. #12 at 16). While this is accurate as a general rule, it is equally accurate that an ALJ errs, as in the instant case, by ignoring or overlooking evidence favorable to a claimant and accepting a medical source opinion (here, Dr. Boyce's opinions) without weighing it under the required regulatory factors.

Accordingly, Plaintiff's challenges to the ALJ's decision at Steps 2 and 4 of the sequential evaluation are well taken.[6]

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See id*.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above.  On remand, the ALJ should be directed to (1) re-evaluate the combined impact of Plaintiff's severe and non-severe impairments have on his work abilities as required by the Commissioner's Regulations; (2) weigh the medical source opinions, including those of Dr. Boyce, under the legal criteria required under the Regulations; and (3) determine anew, through the sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB.

Accordingly, the case should be remanded to the Commissioner and the ALJ for

---

[6]  Because of this conclusion, and the resulting need to remand this case for further administrative proceedings, an in-depth analysis of Plaintiff's remaining challenges to the ALJ's decision is unwarranted.

further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's final non-disability determination be vacated;

2.     No finding be made as to whether Plaintiff William Schulten, Jr. was under a "disability" within the meaning of the Social Security Act;

3.     This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.     The case be terminated on the docket of this Court.


February 3, 2009

                                          s/Sharon L. Ovington
                                        Sharon L. Ovington
                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).